**Kobe BRYANT, Plaintiff,**

v.

**OXXFORD EXPRESS, INC., et al., Defendants.**

**No. CV 00–7631 AHM(JWJx).**

United States District Court, C.D. California.

Dec. 5, 2000.

William D. Temko, Devon A. Gold, Munger Tolles & Olson, Los Angeles, CA, for Plaintiff.

Michael K. Brown, Kenneth Neil Smersfelt, Crosby Heafey Roach & May, Los Angeles, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION TO ENJOIN (AS MODIFIED) THE PROSECUTION OF LATER FILED ACTION IN NEW JERSEY; DENYING DEFENDANT'S MOTION TO TRANSFER

MATZ, District Judge.

### INTRODUCTION AND FACTS

Sometime before May 6, 1996, a high school basketball phenom from Pennsylvania declared himself eligible for the N.B.A. draft. This was in those ancient days when there were almost no "pros" who had not played at least one year of college ball. Sure, there had been the occasional Moses Malone or Bill Willoughby, but the

O'Neals[1] and Miles's and McGradys of the world of hoops were still learning how to shave. Even the most acclaimed player that the Philadelphia area had ever spawned, the Overbrook High School grad who later chose nearby Hershey, Pennsylvania as the site to score 100 points in a single game, had played three seasons of college ball. Most fans, even ardent ones, could not tell a "Kobe" from a jellybean.

Fast forward a season or two and it had become clear that a "Kobe" was a valuable commodity, especially in an autograph. That is undoubtedly what Classic Marketing, Inc., and The Score Board bet on when they entered into a License Agreement with plaintiff, Kobe Bryant ("Bryant"), on May 6, 1996. Under the License Agreement, in return for being granted an exclusive license to market products containing autographs and collectibles, the Licensees agreed to pay Bryant $10,000 upfront, various contingent bonuses dependent on how high a draft pick he became and the sum of $2.00 per autograph for a specified amount of autographs each year.[2]

The License Agreement contained clauses specifying that it would be construed and governed in accordance with New Jersey law (Classic Marketing and The Score Board were New Jersey companies) and that the parties would "irrevocably submit to the jurisdiction of any New Jersey state or [federal] court sitting in Camden County [New Jersey]" and that "all claims [arising] out of the contract . . . may be heard and determined in such New Jersey state or federal court."

Defendant Oxxford Express Inc. ("Oxxford") is the successor-in-interest to The Score Board, one of the original Licensees. Oxxford acquired its interest in a bankruptcy proceeding, over Bryant's opposition. Thereafter, it entered into various contracts with third parties to sell collectibles signed by Bryant. One of the contracts was with RealLegends.com ("RealLegends").

How bittersweet can be the fruits of success! A scant four seasons (and one championship) later, Bryant and Oxxford dispute their remaining rights and obligations under the License Agreement. They also dispute where their dispute should be resolved.

Beginning sometime in 2000, representatives of Bryant and Oxxford exchanged various communications in which they attempted to resolve their differences. On June 14, 2000, Oxxford faxed a letter to Bryant's representative in which it stated:

> If we do not obtain assurance that Mr. Bryant will fulfill his contractual obligations, you will leave us no choice but to declare a breach. You have previously been advised that Oxxford has contracts which it must fulfill, which await these autographs. If Mr. Bryant will not honor the contract, we will suffer consequential damages for which we will seek indemnification. Please advise us by no later than the close of business tomorrow whether Mr. Bryant intends to breach or comply with the contract.

Already familiar with the virtues of a Jabbar–to–Worthy like fast break, Bryant promptly responded the next day, by having his lawyers file a complaint in the Los Angeles Superior Court seeking declaratory relief. They served that complaint on Oxxford on June 16, 2000. Oxxford answered in state court on July 13, 2000, without asserting the state court equivalent of any counterclaims against Bryant. Oxxford then removed the case to this

---

1. Jermaine, of course.

2. The term of the License Agreement was through December 31, 1998.

Court on July 14, 2000. On July 24, 2000, RealLegends, a California company, sued Oxxford, a New Jersey corporation with its principal place of business in New Jersey, in the United States District Court for the District of New Jersey. RealLegends alleged that Oxxford breached contractual obligations to provide it with Kobe Bryant-autographed memorabilia. On September 21, 2000, three months after this suit was filed, Oxxford filed a third party complaint against Bryant in the New Jersey action seeking indemnification, on the theory that Bryant caused it to breach the RealLegends–Oxxford license agreement. On October 4, 2000, Oxxford amended its answer in the RealLegends case to assert an affirmative defense that Bryant made its performance impossible. Bryant's response to the third party complaint in the New Jersey action is not due until January 2, 2001.

This Court held a Mandatory Status Conference on November 20, 2000 at which it set a trial date of August 28, 2001.

## DISCUSSION

Bryant seeks to enjoin Oxxford's prosecution of its third party complaint against him in the New Jersey action under the first-to-file rule. Oxxford, in turn, contends that the Court should transfer this action to the District of New Jersey pursuant to § 1404(a). Because the first-to file rule applies and Oxxford presents no compelling evidence that would warrant a transfer, the Court GRANTS Bryant's Motion and DENIES Oxxford's Motion.

### I. First to File Rule

■ The first-to-file rule states that when two suits are pending involving the same parties and issues, the action filed first ordinarily should proceed to judgment. *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622 (9th Cir.1991); *Decker*

*Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986). *Guthy–Renker Fitness, L.L.C. v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 269 (C.D.Cal. 1998). "Three threshold factors should be considered in deciding whether to apply the first-to-file rule: (1) the chronology of the two actions; (2) the similarity of the parties; and (3) the similarity of the issues." *Id.* at 270. There is no doubt that all three of the threshold factors are satisfied here because (1) this action was filed first; (2) the third party complaint implicates the same parties; and (3) both actions involve the same issues concerning the parties' respective rights and obligations under the same license agreement.

Oxxford argues that equitable exceptions to the first-to-file rule apply here, such as a "bad faith and anticipatory suit filed for the purpose of forum shopping" or because the "balance of convenience weighs in favor of the later-filed action."

### II. Exceptions to the First to File Rule

#### A. Anticipatory Suit Exception

■ Oxxford argues that because Bryant filed this action in an obvious response to its letter of June 14, 2000, he "raced to the courthouse" in a brazen display of forum shopping. There is some merit to that contention, although Oxxford's letter indicated only that it would "declare a breach" and that it would "seek indemnification" if Bryant did not honor the license agreement. Such language no doubt put Bryant "on notice that [Oxxford] was at least considering filing suit against [him]. [Oxxford's] letter, however, gave no indication that a lawsuit was imminent, or that [Oxxford] was doing anything more than blowing smoke about a potential lawsuit." *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1007 (8th Cir.1993) (affirming district court's appli-

cation of the first-filed rule to declaratory judgment action and its injunction against prosecution of later filed action).

It is basic contract law that declaring a breach, which is what Oxxford threatened to do here, does not necessarily indicate a lawsuit will follow, but can be merely the first step in excusing one's self from future performance under the contract. See, e.g., 4 Corbin, Corbin on Contracts § 975 (1951) ("a repudiation of his duty by one of the parties terminates the duty of the other"). The fact that Oxxford stated that it would "seek indemnification" did not necessarily indicate that it would quickly file suit, but rather that if and when third parties sued Oxxford for not providing Bryant memorabilia and prevailed, Oxxford would seek from Bryant recovery of any resulting judgment against it. Moreover, there is evidence in the pre-suit letter exchanges that Bryant had sought to end a barrage of demand letters from Oxxford.[3] That is, Bryant had a pre-existing (i.e., before Oxxford's June 14, 2000 letter) motive for going to court.

In short, the Court finds no bad faith on the part of Bryant in filing this action in his home district.

### B. Balance of Convenience

As to Oxxford's Motion to Transfer, Oxxford bears the burden of showing that transfer is appropriate. Decker Coal, 805 F.2d at 843 ("The defendant must make a strong showing of inconvenience [on a 28 U.S.C. § 1404(a) motion to transfer a first-filed action] to warrant upsetting the plaintiff's choice of forum."). Oxxford argues that the New Jersey action ultimately will require litigation of all the issues in this case concerning the license agreement, even if Oxxford cannot prosecute its cross-claim, because of its "impossibility of performance" affirmative defense. Whether Bryant refused to perform is primarily a factual question, and one that does not appear to be in dispute. At the hearing on these motions, Bryant's counsel agreed that in the New Jersey action Bryant would stipulate that he had refused to sign additional autographs. Thus, the fact of Bryant's non-performance would be established and the New Jersey court would not be required to construe the license agreement.[4] For that reason, there is no risk of conflicting judgments or duplicative judicial effort. See Guthy–Renker, 179 F.R.D. at 269.

Both parties assert that their chosen forum is more convenient for the witnesses. Bryant has identified only witnesses who live in and around Los Angeles. Oxxford has identified witnesses in both Los Angeles and New Jersey, but has not demonstrated how the New Jersey witnesses' testimony is important to this case. In short, potential third party witnesses are located in or near both districts, but most of those witnesses appear to be near Los Angeles. To transfer the case would merely shift the inconveniences to another forum and would not overcome the fact that neither court would be able to compel attendance of all third party witnesses.

Moreover, at the hearing on these motions, Bryant's counsel agreed to make Bryant available for a deposition in New Jersey, at which RealLegends could be

---

**3.** "This letter is to serve as a response to your daily faxes and letters to me requesting an autograph session for Kobe Bryant.... In the meantime, we would appreciate it if you stop sending daily faxes and Federal Express form letters to me." Smersfelt Decl. in Opp. To

Pl.'s Mot. To Enjoin Ex. E (letter dated May 24, 2000 from Rob Pelinka).

**4.** Of course, in this action Bryant would remain free to argue and establish that he had no duty to sign additional autographs.

present and ask questions. The deposition would be taken in, and capable of being used in, both actions.

Oxxford also asserts that the New Jersey court already has interpreted the license agreement at issue in this case and upheld it. The United States Bankruptcy Court found that the Bryant–Score Board Agreement was valid and the District Court upheld that decision. But that ruling was based on principles of contract formation. In any event, there is no evidence that the New Jersey District Court has any greater familiarity with the meaning or interpretation of that agreement than this Court.

The permissive forum selection clause in the license agreement does not compel transfer, though the Court gives it due consideration, as Oxxford urges that it must. That Bryant consented to suit in New Jersey may mean that he could not have successfully objected on the grounds of inconvenience had Oxxford sued first in New Jersey. However, it does not follow that the forum selection clause enables Oxxford to satisfy its burden to show that *this* forum is inappropriate to resolve this action. At most, the permissive forum selection clause is evidence that slightly favors Oxxford in the analysis.

Oxxford also raises relative docket congestion and efficiency of resolution as a reason to transfer this case. The statistical data submitted by the parties indicates no substantial differences in docket congestion. Moreover, the data clearly indicates that civil cases are, on average, resolved more quickly in this district.

Public interest factors seem to favor this forum over New Jersey because performance under the license agreement appears always to have been in California, although potentially the agreement could have been performed anywhere.

Finally, Oxxford contends that the New Jersey court is most familiar with the application of the New Jersey law necessary to resolve this case. However, this factor is entitled to little weight because federal courts routinely apply the law of foreign states when sitting in diversity.

In conclusion, Bryant chose his home court and did so first. Oxxford has failed to make a strong showing of inconvenience to warrant upsetting his choice. Accordingly, although Oxxford went through hoops to get this case transferred, having failed to show harm, there is no foul in requiring that it be tried here.

By not later than December 12, 2000, Bryant shall submit a revised proposed preliminary injunction order that reflects this ruling, including the matters addressed at the hearing.

### CONCLUSION

For the foregoing reasons, and good cause appearing therefor, the Court GRANTS Bryant's Motion and DENIES Oxxford's Motion.

IT IS SO ORDERED.